Below is an opinion of the court.

_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Lance Harding Lupton** and **Amy Slothower,**<br><br>        Debtors. | Case No. 21-30547-dwh7 |
| **Kenneth S. Eiler**, trustee,<br><br>        Plaintiff,<br><br>v.<br><br>**DCF-LLC**, an Oregon limited liability company, and **Eric J. Ridlon**, an individual,<br><br>        Defendants. | Adversary Proceeding No. 21-03025-dwh<br><br>MEMORANDUM DECISION |

Page 1 – MEMORANDUM DECISION

## I. Introduction[1]

Debtor Lance Harding Lupton is trustee of the LHL Living Trust. I refer to him as trustee and to the LHL Living Trust as the trust. I refer to Kenneth S. Eiler, the chapter bankruptcy trustee, by name.

For the reasons that follow, I will—

- Declare that Lupton's prepetition interest in defendant DCF-LLC was not transferred to Eric J. Ridlon and instead is trust property;

- Deny as moot Eiler's alternative requests to avoid and recover the transfer, but also rule that Eiler would prevail on those claims if the transfer had occurred;

- Deny Eiler's request to recover $9,900 from Ridlon, finding that Lupton did not pay that amount to Ridlon; and

- Deny Eiler's requests that I appoint a receiver for DCF and dissolve it.

## II. Preliminary matters

### A. *Trial exhibits*

Trial exhibits 1 through 15 were filed by Eiler,[2] and all were admitted.[3] No exhibits were offered by either defendant.

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.
[2] ECF Nos. 55-1 – 55-4, 61, 55-6 – 55-15, Trial Exhibits (Tr. Exs.) 1–15.
[3] ECF No. 62.

Page 2 – MEMORANDUM DECISION

### B. *Prior determination that trust property was Lupton's property*

I separately determined in the main case that trust property was subject to claims of Lupton's creditors and that Eiler was entitled to turnover property held by the trust.[4] Because I made that determination only in the context of Eiler's motion to require Lupton to turn over trust property, it binds neither DCF nor Ridlon. But the factual bases of that determination—that Lupton is the trust's grantor and trustee and that the trust is revocable—appear in the declaration of trust, which is in the trial record of this action as an attachment to DCF's OnPoint Community Credit Union membership application.[5] No evidence contradicted those facts. And Ridlon did not dispute that the property at issue in this action—membership in DCF held by the trust—was Lupton's when purportedly transferred.

## III. The claims; jurisdiction; court authority

### A. *Claims*

In the amended complaint,[6] Eiler brings six claims for relief, which the complaint refers to as counts. The first claim requests a declaration that Lupton, as trustee, did not resign from DCF or otherwise transfer his membership in DCF to Ridlon, so the membership remains property of the trust. Because the operating agreement and Oregon statutes governing LLCs

---

[4] Case No. 21-30547-dwh7 (main-case) ECF No. 63.
[5] Am. Tr. Ex. 5 at PDF 22-23, 31, ¶ 3.(a).
[6] ECF No. 26.

Page 3 – MEMORANDUM DECISION

refer to a member's withdrawal, rather than resignation, I will use the terms withdraw and withdrawal rather than resign and resignation.

The second claim, in the alternative to the first, requests avoidance under 11 U.S.C. § 548(a)(1)(A) and recovery under 11 U.S.C. § 550 of Lupton's transfer of the membership interest to Ridlon, if it happened. Section 548 permits avoidance of a transfer with actual intent to hinder, delay, or defraud creditors.

The third claim requests avoidance under section 548(a)(1)(B) and recovery under section 550 of Lupton's transfer of the membership interest to Ridlon—again, if it happened. That section permits avoidance of a transfer for less than reasonably equivalent value while the debtor was insolvent or that rendered the debtor insolvent.

The fourth claim seeks avoidance under section 548(a)(1)(B) and recovery of a transfer of $9,900 from Lupton to Ridlon.

The fifth claim seeks appointment of a receiver for DCF under Oregon Revised Statutes chapter 37.

The sixth claim seeks under Oregon Revised Statutes chapter 63 both dissolution of DCF and appointment of a receiver for DCF to administer the dissolution.

### B. *Jurisdiction and bankruptcy court authority*

The district court has referred all bankruptcy cases and proceedings to this court, so this court has authority to hear the claims.[7]

Because the first through fourth claims concern the administration of the estate, they are core proceedings, and I may hear and determine them and enter appropriate judgments.[8]

Determination of the fifth and sixth claims could conceivably affect the administration of the estate, so they are related to the main case, and the district court has jurisdiction over them.[9]

All parties have consented to entry by this court of final judgment,[10] so this court has authority to enter a final judgment.

## IV. Analysis

### A. *First claim: request for declaration that transfer of membership interest did not occur and that the trust retains all of Lupton's membership rights*

In the original operating agreement, signed by Lupton and Ridlon, the trust was the 99.9-percent member and manager of DCF. (Eiler alleged in the amended complaint and argued at trial that the percentage held by Lupton was 99 percent, perhaps because the agreement identified Ridlon's share as 1 percent.)

---

[7] 28 U.S.C. § 157(a); LR 2200-1(a)(1).
[8] 28 U.S.C. § 157(b)(1), (2)(A); ECF No. 26 ¶ 3.
[9] 28 U.S.C.§ 1334(b).
[10] ECF No. 26 at 2 ¶ 4; ECF No. 13 at 3 ¶ 28.

Page 5 – MEMORANDUM DECISION

Eiler argues that the trust's membership interest was never transferred to Ridlon.

### 1. Evidence that the transfer occurred

Some evidence suggests that Lupton, as trustee, withdrew from membership in DCF, leaving Ridlon the sole member. First, the member meeting minutes of January 15, 2020, report the trust's withdrawal from DCF. Eiler argues that the minutes are ineffective because they are not signed on behalf of trust.[11] But he points to no authority requiring that a member's withdrawal from DCF be in writing and signed by the member. Here, the original operating agreement provision authorizing any member to voluntarily withdraw does not require that withdrawal be in writing.[12]

Second, the amended operating agreement, signed only by Ridlon, states that he was then the sole member.[13] It's true that the original operating agreement requires signatures of all members to amend it, making the amended agreement ineffective. But Eiler points to no provision of the agreement or any law that a member may withdraw from or assign its interest in an LLC only in an operating-agreement amendment.

Third, the receipt dated November 20, 2020,[14] which Lupton signed, says that he resigned from DCF. Eiler argues that the receipt is ineffective

---

[11] Tr. Ex. 3.
[12] Tr. Ex. 1 at 6 ¶ 38.
[13] Tr. Ex. 2.
[14] Tr. Ex. 4.

Page 6 – MEMORANDUM DECISION

because it doesn't address the interest of the trust as member. But he points to no authority that a trustee's action as trustee, including withdrawal from an LLC, is ineffective absent an express declaration that the trustee is acting as trustee. Here, Lupton held title to the membership interest in his capacity as trustee of the trust, and there is no evidence that he held a membership interest in any other capacity.

Fourth, Oregon Secretary of State Corporation Division reports, attached to DCF's business membership application to the credit union, identify Ridlon as the sole member. Although Lupton didn't sign those documents, he attached them to the membership application, which he did sign.[15]

Finally, both Lupton and Ridlon testified that Lupton, as trustee, withdrew from DCF, making Ridlon the sole member.

## 2. Evidence that the transfer did not occur

Other evidence suggests that Lupton for the most part acted and held himself out as though he, as trustee, was always a member and manager of DCF. All the events described below occurred after the dates of the amended operating agreement and the receipt.

Lupton testified that, on January 5, 2021, he was DCF's manager.[16]

---

[15] Am. Tr. Ex. 5 at PDF 6–7, 39-40.
[16] ECF No. 76 at 34:24 – 35:1.

Page 7 – MEMORANDUM DECISION

Lupton manages DCF's subcontracting.[17] Ridlon is unaware of Lupton's compensation from DCF [18] or how much debt DCF owes.[19]

At the May 19, 2021, meeting of creditors, Lupton said that he is a member,[20] not an employee,[21] of DCF, and his compensation for services to DCF is a "profit split."[22]

DCF filed three claims of construction lien against Bend Lodging Group LLC, each of which was signed by Lupton as manager of DCF.[23] Lupton testified that he is DCF person "advancing" the state-court action to enforce those liens.[24]

DCF's credit-union membership application was signed only by Lupton on behalf of DCF and himself, and not also by Ridlon.[25] The first of several documents attached to the application was the original operating agreement, naming the trust as 99.9-percent member. The amended operating agreement was not attached, but Lupton testified, both at his deposition and the trial, that he also, but later, gave the credit union the amended agreement. Mark Hoffman, a document-custodian witness for the credit union, could not confirm that testimony.

---

[17] ECF No. 76 at 28:13–14.
[18] ECF No. 76 at 28:19–21.
[19] ECF No. 76 at 29:8–15.
[20] Tr. Ex. 15 at 14:5–8.
[21] Tr. Ex. 15 at 108:23.
[22] Tr. Ex. 15 at 108:16.
[23] Tr. Ex. 14.
[24] Tr. Ex. 15 at 107:10–12.
[25] Am. Tr. Ex. 5.

Page 8 – MEMORANDUM DECISION

Also attached to the application were the certificate of trust agreement and the declaration of trust creating the trust. Had the trust not been a member of DCF, there would have been no reason to attach to the application the original operating agreement, the certificate of trust agreement, or the declaration of trust.

Although Lupton disclaimed membership, he testified at trial that he is entitled to receive from DCF an undefined percentage of profits and in deposition that he is compensated for preparing bids on behalf of DCF.[26]

### 3. Weighing the evidence

The evidence weighs in favor of a finding that Lupton did not, in fact, withdraw from membership in DCF or otherwise transfer that membership to Ridlon. From my observation at trial of the demeanors of Lupton and Ridlon while testifying, I did not believe their testimony that Lupton withdrew. The only document signed by Lupton that is consistent with his withdrawal is the receipt, and there is no evidence that it was communicated to anyone else. Ridlon did testify that he "gave that money back to Lance," which is consistent with Lupton's withdrawal and the receipt mistakenly referring to payment the other way. But Ridlon offered no evidence, such as a cancelled check, to corroborate that statement, and I find that Ridlon did not pay Lupton. By contrast, all other relevant documents that Lupton signed—the

---

[26] Tr. Ex. 15 at 86:16–18.

documents submitted to the credit union and the three lien notices—suggest that the withdrawal never happened.

Lupton's and Ridlon's different knowledge of and practical involvement in DCF's operations are also consistent with Lupton retaining the interest. Lupton was DCF's public face, preparing its bids, doing its banking, signing its lien claims, and directing its lawyers in litigation. And although Lupton is supposedly employed and compensated by DCF to manage its subcontracting, Ridlon does not know how much compensation Lupton receives.

I will thus declare that Lupton did not withdraw from DCF or otherwise assign his interest to Ridlon and thus, on the March 11, 2011, petition date, Lupton, as trustee, was a 99-percent member.

### B. *Second claim: avoidance and recovery of actual-intent fraudulent transfer*

Claims 2 and 3 seek avoidance and recovery of Lupton's transfer of the membership interest. My finding for Eiler on the first claim that no transfer occurred moots those claims. Nonetheless, I will address them as though I had ruled the other way on the first claim.

#### 1. Avoidance

As authority for avoidance under the second claim, Eiler invokes section 548(a)(1)(A), which permits avoidance of a transfer made with actual intent to hinder, delay, or defraud a creditor. To prove actual intent, courts often look to badges of fraud, including retention by the debtor of the

putatively transferred property.[27] Here, Lupton retained control over DCF's assets, and thus his membership interest, by acting, at least to those other than Ridlon, as though he remained a member and manager of DCF, specifically by asserting and exercising authority to disburse funds from its credit-union account and, as putative manager, to assert and enforce lien claims on its behalf.

I find that, if the transfer had not occurred, it would be avoidable as an actual-intent fraudulent transfer.

### 2. Recovery

Under section 550(a)(1), Eiler is entitled to recover an avoided transfer or the value thereof from the initial transferee or any immediate or mediate transfer from the transfer. The event constituting the transfer (had it occurred) is Lupton's purported withdrawal from DCF. It can be seen as a transfer either to DCF, like a share redemption, or to Ridlon, as a transfer directly to him. In either case, there was a single transfer, to either DCF or Ridlon. Accordingly, Eiler need not satisfy the additional requirements in section 550(b)(2) to recover from immediate or mediate transferee from the initial transferee.

Although Eiler seeks in the amended complaint to recover either the membership interest or its value,[28] he seeks in his trial memorandum[29] and

---

[27] *In re* Acequia, Inc., 34 F.3d 800, 805–06 (9th Cir. 1994).
[28] ECF No. 26 at 7 ¶ 26.
[29] ECF No. 53.

Page 11 – MEMORANDUM DECISION

sought at trial only to recover the transfer and not alternatively to recover the value thereof. Because there is no evidence that the membership interest had a specific value, I would not award recovery of the value of the avoided transfer from Ridlon.

Had the transfer occurred, Eiler would be entitled to judgment that the transfer be avoided and recovered, but I would not award a money judgment against Ridlon.

### C. Third claim: avoidance and recovery of constructively fraudulent transfer

Eiler also invokes section 548(a)(1)(B), which permits avoidance of a constructively fraudulent transfer—one made for less than reasonably equivalent value while the debtor was insolvent.

#### 1. Avoidance

##### (a) Value of property transferred

The value of the trust's 99-percent interest in DCF is 99 percent of DCF's net worth, the value of its assets less its debts.

DCF has either no money or $3,000, no noncash assets,[30] and no jobs or projects going.[31] DCF has sued to recover $678,959.65 from Bend Lodging Group. Although DCF has no funds with which to prosecute that action, and Lupton and Ridlon were pessimistic about its value, I have no evidence that

---

[30] ECF No. 76 at 28:3; 29:3–5, 6–7.
[31] ECF No. 76 at 29:16-18.

Page 12 – MEMORANDUM DECISION

the claim is worthless or of the amount by which I should discount its face amount to determine its value.

I have evidence that DCF borrowed from the trust a total of $405,000 between April 23 and May 21, 2021.[32]

Because DCF has assets nominally worth more than $200,000 more than its debts, I find that DCF is worth that amount, and the trust's membership is worth 99 percent of that amount.

### (b)  *Value received for transfer*

There was conflicting evidence whether Lupton received payment for his resignation from DCF. The receipt says that Ridlon "received $9,900.00 cash" from Lupton for Lupton's capital contribution.[33] The receipt is the basis for Eiler's fourth claim, seeking to recover $9,900 from Ridlon.

The $9,900 amount corresponds to the capital-contribution amount—from the trust—in the original operating agreement.[34] It would be illogical for Lupton's resignation to result in a $9,900 payment from—rather than to— him. Indeed, Ridlon testified in relation to the $9,900 amount that he "gave that money back to" Lupton. Nonetheless, from Ridlon's demeanor and the absence of any positive evidence from him of that payment, I did not believe his testimony, and I find that he did not in fact pay Lupton.

---

[32] ECF No. 79 at 14:9-20, 14:24 – 15:3, 16:2–6, 18:13–17.
[33] Tr. Ex. 4.
[34] Tr. Ex. 1 at 2 ¶ 6.

Page 13 – MEMORANDUM DECISION

Because the trust's membership is nominally worth more than $200,000 and Lupton received nothing for giving up that interest, Lupton did not receive reasonably equivalent value for the transfer.

### (c) *Lupton's insolvency*

Lupton testified without contradiction that he was insolvent at all relevant times.[35]

Accordingly, I find that the transfer, if had occurred, was for less than reasonably equivalent value while Lupton was insolvent and would thus be avoidable under section 548(a)(1)(B).

### 2. Recovery

As with the second claim, had the transfer occurred, Eiler would be entitled to judgment on the third claim that the transfer be avoided and recovered, but I also would not award a money judgment against Ridlon.

### D. *Fourth claim: avoidance and recovery of $9,900 payment*

The fourth claim also seeks avoidance, but this time of the alleged payment by Lupton to Ridlon of $9,900.

Because I have found that Lupton did not pay Ridlon, I will deny the fourth claim.

---

[35] ECF No. 76 at 54:20 – 55:3.

### E. Fifth claim: receiver appointment under Oregon Receivership Code

The fifth claim seeks appointment of a receiver for DCF. As authority, Eiler relies on Oregon Revised Statutes § 37.060, which lists circumstances in which a court "may" appoint a receiver.

#### 1. Section 37.020

Oregon Revised Statutes chapter 37, sections 37.010 through 37.410, is also referred to as the Oregon Receivership Code. Section 37.020 describes receivership as the appointment of a person "to take charge of property during the pendency of an action or upon a judgment or order entered therein." By referring to receiver appointment as a remedy that may be granted during an action or upon a judgment or order, that section implicitly distinguishes receiver appointment from the claims asserted in a complaint or the relief granted in a judgment or order on a claim. In other words, the statute treats receiver appointment as a remedy ancillary to a claim but not as a stand-alone claim. So, as defined in section 37.020, a receiver cannot be appointed just for the sake of appointing a receiver, but rather only as relief ancillary to a claim.

Here, Eiler's fifth claim requests judgment simply "appointing a receiver over DCF" under the Receivership Code.[36] It identifies no other claim to which receiver appointment would be ancillary. Other than the fifth and sixth claims, which request receiver appointment, the claims seek relief for

---

[36] ECF No. 26 at 10 ¶ 5.

Page 15 – MEMORANDUM DECISION

which receiver appointment would not be ancillary: declaratory judgment (first claim) and transfer avoidance and recovery (second through fourth claims). Receiver appointment would thus be inconsistent with section 37.020.

Even if section 37.020 did not foreclose consideration of the Receivership Code as authority for receiver appointment in this action, the specific portions of the Receivership Code on which Eiler relies do not support that relief. In his trial brief, he relies on two conditions for receiver appointment in section 37.060, those addressed in sections 37.060(1)(a) and (i). At trial, he also relied on a third, that addressed in section 37.060(1)(g).

### 2. Section 37.060(1)(a): to protect property that is the subject of the action

Under section 37.060(1)(a), a receiver may be appointed "[b]efore judgment" to protect property that is the subject of the action, or rents or profits deriving from the property.

Here, Eiler seeks receiver appointment as part of, but not before, judgment. Thus, section 36.060(1)(a) is not a ground for receiver appointment.

### 3. Section 37.060(1)(g): after dissolution or in case of insolvency

Under section 37.060(1)(g), a receiver may be appointed for an entity that has been dissolved or is insolvent or in imminent danger of insolvency if

Page 16 – MEMORANDUM DECISION

receivership is reasonably necessary to protect the entity's property or to conserve or protect the interests of the entity's owners.

DCF has not been dissolved. The Receivership Code includes a balance-sheet definition of insolvency like the definition in the Bankruptcy Code.[37] I have found above that DCF's assets are nominally worth more than $200,000 more than its debts. I thus cannot find that DCF is insolvent or in imminent danger of insolvency. So, section 36.060(1)(g) is not a ground for receiver appointment.

### 4. Section 37.060(1)(i): to secure justice to the parties

Under section 37.060(1)(i), a receiver may be appointed where the appointment "is reasonably necessary to secure justice to the parties." When read in conjunction with section 37.020, section 37.060(1)(i)'s reference to "justice" must mean justice as determined by the judicial process: a ruling on a legally cognizable claim asserted in a complaint and supported by evidence. In other words, receiver appointment under section 37.060(1)(i) is appropriate if necessary to secure to the parties the relief (justice) determined by the court's ruling on a claim.

Eiler does not identify any claim in this action for which justice can be secured only by receiver appointment. Appointment of a receiver for DCF is thus not warranted by the Receivership Code statutes on which Eiler relies. I will deny the fifth claim.

---

[37] 11 U.S.C. § 101(32).

### F. Claim 6: dissolution and receiver appointment under Oregon Revised Statutes § 63.661(1)(b)

Eiler asserts the sixth claim as an alternative to the fifth claim. In the sixth claim, he seeks both dissolution of DCF and appointment of a receiver for it, relying on Oregon Revised Statutes § 63.661(1)(b). That section authorizes judicial dissolution of an Oregon LLC in a proceeding by or for a member if it is not reasonably practicable to carry on the business of DCF in conformance with its articles of organization or any operating agreement.

At trial Eiler expressly disclaimed any request that I determine that he has more than the economic rights previously held by Lupton on behalf of the trust.[38] Thus, Eiler is not a member and may not invoke section 63.661(1)(b)—invocable only by a member—to dissolve DCF as a predicate to obtaining a receiver for it.

I would deny the sixth claim even if the estate were a member of DCF. Eiler argues that it is not reasonably practicable to carry on DCF's business due to his inability to exercise management rights. I disagree. The statute addresses the ability of an LLC to carry on its business, not the ability of a member's assignee to control the LLC's carrying on of the business. It would be inappropriate to dissolve DCF and then appoint a receiver just to circumvent state-law restrictions on a chapter 7 trustee's power to exercise management or voting rights.

---

[38] ECF No. 79 at 32:9–10.

I will deny the sixth claim.

## V. Conclusion

I will enter judgment—

(1) on the first claim determining that Lupton did not resign from DCF and did not transfer the trust's membership interest in DCF to Ridlon, and preceding the filing of the petition, the trust held a 99-percent membership interest in DCF;

(2) denying as moot the second and third claims, and

(3) denying the fourth through sixth claims.

# # #

cc: DCF-LLC
     Eric J. Ridlon